**2016-1962, -1963, -1964, -1965, -1966, -1968, -1970, -1971,**
**-1972, -1973, -1974, -1975, -1977, -1978**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

OTSUKA PHARMACEUTICAL CO., LTD.,

*Plaintiff-Appellant*,

v.

ZYDUS PHARMACEUTICALS USA, INC., CADILA HEALTHCARE, LIMITED, MYLAN INC., MYLAN PHARMACEUTICALS INC., TORRENT PHARMACEUTICALS LIMITED, TORRENT PHARMA INC., HETERO LABS LIMITED, HUAHAI US INC., PRINSTON PHARMACEUTICAL INC., SOLCO HEALTHCARE U.S., LLC, AJANTA PHARMA LIMITED, AJANTA PHARMA USA INC., AUROBINDO PHARMA LTD., INTAS PHARMACEUTICALS LIMITED, ACCORD HEALTHCARE INC., AUROBINDO PHARMA USA INC., AUROLIFE PHARMA LLC, LUPIN LIMITED, LUPIN ATLANTIS HOLDINGS S.A., LUPIN PHARMACEUTICALS, INC., ALEMBIC PHARMACEUTICALS LIMITED, APOTEX CORP., APOTEX INC., SCIEGEN PHARMACEUTICALS INC., BACTOLAC PHARMACEUTICAL, INC., HETERO DRUGS LIMITED, HETERO USA, INC., AMNEAL PHARMACEUTICALS, LLC, AMNEAL PHARMACEUTICALS INDIA PVT. LTD.,

*Defendants-Appellees*.

Appeals from the United States District Court for the District of New Jersey in Case Nos. 14-cv-03168, 14-cv-04508, 14-cv-04671, 14-cv-05537, 14-cv-05876, 14-cv-06158, 14-cv-06890, 14-cv-07105, 14-cv-07252, 14-cv-07405, 14-cv-08074, 14-cv-08077, 15-cv-00161, 15-cv-01585, Chief Judge Jerome B. Simandle.

**CORRECTED BRIEF FOR PLAINTIFF-APPELLANT**
**OTSUKA PHARMACEUTICAL CO., LTD.**

James B. Monroe
Paul W. Browning
Eric J. Fues
Denise Main
Jeffrey A. Freeman
Charles T. Collins-Chase
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

September 6, 2016

*Attorneys for Plaintiff-Appellant*
*Otsuka Pharmaceutical Co., Ltd.*

# CERTIFICATE OF INTEREST

**Counsel for the Appellant, Otsuka Pharmaceutical Co., Ltd., certifies the following:**

1.      The full name of every party represented by me is:

Otsuka Pharmaceutical Co., Ltd.

2.      The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Otsuka Holdings Co., Ltd.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

James B. Monroe
Paul W. Browning
Eric J. Fues
Denise Main
Michael J. Flibbert
Justin J. Hasford
Charles T. Collins-Chase
Samhitha Muralidhar
Erin Sommers
Andrew Renison
Lauren Dowty
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

i

Jeffrey A. Freeman
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
271 17th Street, NW Suite 1400
Atlanta, GA  30363-6209
 (404) 653-6400

Melissa Chuderewicz
Brian Zurich
Christopher Soper
John F. Brenner (No Longer with Pepper Hamilton LLP)
PEPPER HAMILTON LLP
Suite 400
301 Carnegie Center
Princeton, New Jersey 08543-5276
(609) 452-0808

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................................i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................. v

STATEMENT OF RELATED CASES ................................................ vi

STATEMENT OF JURISDICTION.................................................... 1

I.     STATEMENT OF THE ISSUES ................................................ 2

II.    STATEMENT OF THE CASE .................................................. 2

III.   STATEMENT OF FACTS ....................................................... 5

     A.    The Underlying District Court Litigations ........................... 5

     B.    The '350 Patent Specification ............................................ 5

     C.    The '350 Patent Prosecution History ................................. 13

     D.    The '350 Patent Claims ..................................................... 18

     E.    The District Court's Preliminary Claim Construction ....................... 19

     F.    *Markman* Proceedings and the District Court's Final Claim Construction ....................................................................... 27

          1.    Intrinsic Evidence .................................................... 27

          2.    Extrinsic Evidence ................................................... 30

     G.    The District Court's Grant of Summary Judgment of Noninfringement ............................................................... 32

IV.   SUMMARY OF THE ARGUMENT ...................................... 33

V.    LEGAL STANDARDS ........................................................... 37

VI.    ARGUMENT ...........................................................................39

    A.    The District Court Erred in Construing the Claim Terms "a/the Pharmaceutical Composition" and "in Combination with" as Limited to a Single Dosage Form ......................................................39

        1.    The Plain Language of the Claims Does Not Limit a "Pharmaceutical Composition" to a Single Dosage Form ........39

        2.    The District Court Erred by Ignoring the Intrinsic Record's Teachings That the Claimed Pharmaceutical Composition May Include Multiple Dosage Forms .................42

            a.    The '350 Patent Specification Repeatedly Teaches Pharmaceutical Compositions Comprising Aripiprazole and the SRI in Separate Dosage Forms ............................................................................44

            b.    The '350 Patent's Prosecution History Also Shows That the Claims Cover Compositions Comprising More Than One Dosage Form ........................................51

        3.    The Undisputed Extrinsic Record Establishes That Clinicians Typically Use Separate Dosage Forms When Prescribing Aripiprazole in Combination with an SRI.............55

        4.    The Court Should Discount Defendants' Expert Testimony Regarding the Plain Meaning of the Claims Because the Experts Failed to Analyze the Claim Language in the Context of the Specification and Prosecution History.................................................................58

    B.    The Court Should Reverse the District Court's Orders Granting Summary Judgment of Noninfringement of the '350 Patent ..............61

VII.    CONCLUSION.............................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
 381 F.3d 1111 (Fed. Cir. 2004) ...................................................................38, 51

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
 358 F.3d 898 (Fed. Cir. 2004) ..........................................................................51

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995) (en banc) ............................................................38

*Medrad, Inc. v. MRI Devices Corp.*,
 401 F.3d 1313 (Fed. Cir. 2005) ........................................................................37

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................*passim*

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
 135 S. Ct. 831 (2015)........................................................................................37

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996) .................................................................... 50-51

## Statutes

28 U.S.C. § 1295(a)(1)...........................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

28 U.S.C. § 1338(a) ...............................................................................................1

## Rules

Fed. R. App. P. 4(a)(1)(A) .....................................................................................1

Fed. R. Civ. P. 54(b) ..................................................................................1, 33, 61

## STATEMENT OF RELATED CASES

No other appeals in or from the underlying district court proceedings were previously before this or any other appellate court.  Eleven of the underlying district court matters, which involve patents not at issue in this appeal, are proceeding concurrently as to those patents (Case Nos. 14-cv-4671, 14-cv-3168, 14-cv-7252, 15-cv-1585, 15-cv-161, 14-cv-4508, 14-cv-8074, 14-cv-7105, 14-cv-5537, 14-cv-8077 and 14-cv-5876).  Other pending district court cases involving U.S. Patent No. 8,759,350 are Case Nos. 15-cv-1967, 15-cv-5109 and 15-cv-6353.

## STATEMENT OF JURISDICTION

The U.S. District Court for the District of New Jersey (Chief Judge Jerome B. Simandle) had jurisdiction over the patent-infringement actions giving rise to these consolidated appeals pursuant to 28 U.S.C. §§ 1331 and 1338(a).

This Court has jurisdiction over these appeals under 28 U.S.C. § 1295(a)(1).

In accordance with Fed. R. App. P. 4(a)(1)(A), on April 29, 2016, Plaintiff-Appellant timely filed notices of appeal from the Orders for Partial Rule 56 Summary Judgment entered on January 19, 2016 (Case Nos. 14-cv-4671, 14-cv-3168, and 14-cv-7252); February 9, 2016 (Case Nos. 15-cv-1585, 15-cv-161, and 14-cv-4508); February 10, 2016 (Case Nos. 14-cv-8074 and 14-cv-7105); February 22, 2016 (Case Nos. 14-cv-5537 and 14-cv-8077); and March 9, 2016 (Case No. 14-cv-5876), which the district court certified pursuant to Fed. R. Civ. P. 54(b) on April 12, 2016. Plaintiff-Appellant also timely filed notices of appeal from the Final Judgments entered on March 30, 2016 (Case Nos. 14-cv-6158, 14-cv-6890, and 14-cv-7405).

## I.     STATEMENT OF THE ISSUES

1.     Did the district court err in construing the claim language "a/the pharmaceutical composition" and "in combination with" as limited to compositions that include the at least two active ingredients *in a single dosage form*, where the claim language does not limit the claimed compositions to a single dosage form and where the specification and prosecution history both disclose numerous embodiments in which the claimed compositions include *more than one dosage form*?

## II.     STATEMENT OF THE CASE

This appeal turns on whether the claim language "a/the pharmaceutical composition" and "in combination with" limits the claimed compositions to a single dosage form.  The claims of U.S. Patent No. 8,759,350 ("the '350 patent") recite compositions that comprise the carbostyril derivative aripiprazole in combination with at least one serotonin reuptake inhibitor ("SRI").  They do not limit these compositions to a single dosage form or any particular mode of administration.

The '350 patent specification and prosecution history contain numerous disclosures of compositions in which aripiprazole and an SRI are contained in *separate* dosage forms.  Moreover, six of the nine examples in the '350 patent use separate dosage forms for the aripiprazole and the SRI.  These disclosures are

consistent with the patent's teaching that the key aspect of the invention—the synergistic effect resulting from administering aripiprazole in combination with an SRI—can be achieved by any means that results in effective levels of both drugs at the same time.  Appx280[14:9-12].

The prosecution history similarly establishes that Otsuka Pharmaceutical Co., Ltd. ("Otsuka"), intended for the claimed "pharmaceutical composition" to include embodiments with more than one dosage form.  Otsuka consistently referred to administering separate dosage forms of aripiprazole and an SRI as falling within the scope of the claims.  Otsuka also submitted two declarations by named inventor Dr. Tsuyoshi Hirose, which contained data showing the unexpectedly synergistic results of the claimed combination of aripiprazole and an SRI.  Dr. Hirose described his administration of separate dosage forms of aripiprazole and an SRI, at separate times, as "the present inventive combination."  Appx4954.

Despite these disclosures, the district court construed the disputed terms as limiting the claims to a single dosage form.  The court relied heavily on its interpretation of "pharmaceutical composition" as a singular noun, which it concluded meant that the claimed compositions must also include only a single dosage form.  The district court interpreted the claims from the perspective of a "lay person," Appx173-174, concluding that the claimed composition "requires no

complex construction," Appx172.  After concluding that the plain claim language limited the novel compositions to a single dosage form, the court dismissed the disclosures in the specification and prosecution history that contradicted this conclusion.   It reasoned that those disclosures contradicted the plain claim language, and thus must relate only to unclaimed, alternative embodiments.

Although the district court based its claim construction only on portions of the intrinsic record, it did make a finding that "the undisputed extrinsic reality [was] that psychiatrists do not, as a practical matter, prescribe single dosage forms of antipsychotics and antidepressants."   Appx131-132.   The court based this finding largely on the testimony of Otsuka's expert, Dr. Christoph U. Correll, who was the only expert who properly analyzed the full intrinsic record, including the specification and prosecution history, from the perspective of a person of ordinary skill in the art.  Dr. Correll testified that a skilled artisan at the time of invention would have understood the '350 patent's use of the term "pharmaceutical composition" to include embodiments with more than one dosage form.

Based on its claim construction limiting the claims to compositions comprising a single dosage form, the district court entered summary judgment of noninfringement in each of the fourteen underlying litigations.   Otsuka now appeals from the court's entry of summary judgment based on its erroneous claim construction.

## III.   STATEMENT OF FACTS

### A.   The Underlying District Court Litigations

This consolidated appeal arises from fourteen district court litigations involving infringement of Otsuka's patents relating to its Abilify® product, which is one of the most successful pharmaceuticals ever marketed.   The active pharmaceutical ingredient in Abilify® is aripiprazole, which was originally developed as an antipsychotic medication useful in the treatment of schizophrenia and related disorders.   Aripiprazole has unique pharmacological properties compared to other antipsychotic medications, however, which makes it useful in the treatment of a variety of other psychological disorders.

Due to its unique properties, Abilify® is effective as an adjunctive therapy for major depressive disorder, where it is used in combination with another antidepressant drug.   Otsuka's '350 patent generally relates to Otsuka's discovery of unexpectedly synergistic effects when administering aripiprazole in combination with an SRI such as citalopram or escitalopram.

### B.   The '350 Patent Specification

The '350 patent is directed to pharmaceutical compositions comprising carbostyril derivatives, such as aripiprazole and its metabolites, in combination with SRIs, either as separate dosage forms or as a single dosage form.   *See, e.g.*, Appx275[3:52-64]; Appx274[1:18-21].   The patent also discloses and claims methods of treating mood disorders, including depression and major depressive

5

disorder, comprising administration of an effective amount of these novel pharmaceutical compositions. Appx274[1:22-24].

The pharmaceutical compositions described in the '350 patent solve several problems with prior art methods and compositions. Tricyclic antidepressants and SRIs alone, for example, are not always effective at treating all depressed patients. Appx274[2:12-18]. Indeed, about 30% of depressed patients do not respond to these antidepressants. *Id.* When a single antidepressant is not effective, physicians may try adding a second antidepressant. Yet for patients whose symptoms were not controlled with tricyclic antidepressants or SRIs alone, administering a second or third antidepressant still results in insufficient improvement of symptoms in about 10% of patients. Appx274[2:18-22].

Others have proposed combination therapies using an atypical antipsychotic drug such as olanzapine, together with an antidepressant such as an SRI. Appx274[2:31-37]. These treatments, however, have the disadvantage that commercially available atypical antipsychotic drugs have significant safety problems and side effects, such as increased body weight and enhanced risk of diabetes mellitus. Appx274[2:37-45].

The compositions and methods disclosed in the '350 patent solve these problems by administering at least one SRI in combination with a carbostyril derivative. Appx276[6:47-51]. Aripiprazole and its metabolites, such as

6

dehydroaripiprazole, are among the preferred carbostyril derivatives disclosed in the '350 patent. Appx277[7:18-22]. Aripiprazole's mechanism of action differs from other atypical antipsychotic drugs; it belongs to a new category of drug defined as dopamine-serotonin system stabilizers. Appx277[7:45-63]. Aripiprazole is useful for treating several types of depression, including major depression. Appx277[7:35-40].

The '350 patent's inventors discovered that combining an SRI with a carbostyril derivative such as aripiprazole resulted in unexpectedly superior antidepressant effects. Appx4953-4959; Appx6109-6112; *see also* Appx287[28:4-61]. The patent states, for example, that combination administration of aripiprazole and an SRI resulted in an increase in antidepressant activity compared to single use of either aripiprazole or the SRIs. Appx283[20:27-41]. Further, the '350 patent explains that combination administration of aripiprazole and an SRI also resulted in an increase in antidepressant activity compared to other atypical antipsychotic drugs in combination with an SRI. *Id.* Similarly, Example 9 of the patent discusses the results of a pharmacological test in which the combination of aripiprazole and the SRI citalopram were administered in separate dosage forms. Appx287[28:26-34]. This combination therapy resulted in a statistically significant improvement in antidepressant effect compared to either aripiprazole or

citalopram administered alone.  *Id.*  The results of this test are shown in Table 3 of the '350 patent.  Appx287[28:45-61].

The unexpectedly superior effects of the claimed compositions and methods are also discussed in two declarations submitted during prosecution of the '350 patent by one of the named inventors, Dr. Hirose.  Appx4953-4959; Appx6109-6112.  In these declarations, Dr. Hirose discussed results of a forced swimming test, which is widely used as an animal model for predicting antidepressant activity in clinical settings.  Appx4953-4959; Appx6109-6112; *see also* Appx283[19:60-63].  These results showed that combinations of *other* atypical antipsychotic drugs with an SRI (e.g., risperidone in combination with citalopram) did not significantly improve antidepressant activity compared to administration of the SRI or antipsychotic alone.  Appx4955-4958.

The '350 patent specification states that the claimed compositions combining an SRI and carbostyril derivative may be combined in a single dosage form, or alternatively may be given as separate dosage forms.  For example, the '350 patent states:

> ***The novel compositions of [the] present invention*** comprising at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and at least one serotonin reuptake inhibitor in a pharmaceutically acceptable carrier ***may be combined in one dosage form***, for example a pill.  ***Alternatively*** the at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and the at least one

8

> serotonin reuptake inhibitor ***may be in separate dosage
> forms, each in a pharmaceutically acceptable carrier***.
> These compositions are administered to a patient with a
> mood disorder, particularly depression or major
> depressive disorder, in an amount and dosage regimen
> effective to treat the mood disorder.

Appx275[3:52-64] (emphases added).

The '350 patent explains that, regardless of dosing or dosage forms, the key

consideration for achieving the synergistic effect of a carbostyril derivative in

combination with an SRI is ensuring the two drugs are present in the body at

effective concentrations at the same time.  Appx280[14:9-12].  The specification

thus states:

> Administration forms of the pharmaceutical composition
> of the present invention may be any type by which the
> effective levels of both carbostyril derivatives and
> serotonin reuptake inhibitors can be provide[d] in vivo at
> the same time.

*Id.*

The '350 patent further explains that, in order for the composition to achieve

effective levels of both the carbostyril derivative and the SRI, both drugs may be

contained in a single dosage form or each drug may instead be contained in a

separate dosage form.   For example, the '350 patent states that, in one

embodiment, the carbostyril derivative and the SRI "are contained in one

pharmaceutical composition."  Appx280[14:12-15].  In another embodiment of the

pharmaceutical composition of the claimed invention, however, the carbostyril

derivative and the SRI are in separate dosage forms that may be administered at separate times.  The specification states:

> On the other hand, each one of [the] carbostyril derivative and a serotonin reuptake inhibitor are [sic] contained individually in a pharmaceutical preparation respectively, and each one of these preparations may be administered at the same time or in suitable intervals.

Appx280[14:16-20].  The '350 patent specification similarly explains that the "methods for administration of the pharmaceutical composition of the present invention are not specifically restricted," and that "[t]he composition is ***administered depending on each type of preparation forms***," among other factors. Appx280[13:63-14:8] (emphasis added).

Administering a composition in which the carbostyril derivative and SRI are in separate dosage forms is consistent with the '350 patent's description of "augmentation therapy," in which a patient who is already taking one drug to treat a medical condition, such as depression, begins taking a second drug to treat the same condition.  *See, e.g.*, Appx286[25:26-30]; Appx286[26:47-51].  As the '350 patent notes, for example, some patients' depression is well treated using only one drug, and other drugs are added later only if the first drug does not resolve the patient's symptoms.  Appx274[2:12-23].  The second drug in combination or augmentation therapy thus is additive, and it typically is administered as a separate

dosage form while the patient continues taking the originally prescribed drug, rather than combined in a single dosage form with the originally prescribed drug.

Examples 5 and 7, for example, discuss adding aripiprazole "as an ***augmentation therapy*** in depressed patients with major depressive disorder who were previously non-responsive or partially responsive to anti-depressant medication comprising serotonin reuptake inhibitors."     Appx286[25:26-30] (emphasis added); *see also* Appx286[26:47-51].    Those patients were already "receiv[ing] therapy through administration of serotonin reuptake inhibitors," and thus the aripiprazole was added to the existing SRI regimen and administered using a separate dosage form.  Appx286[25:30-44]; *see also* Appx286[26:51-67].

Administering a composition in which two drugs are administered in separate dosage forms is also consistent with the '350 patent's disclosure that the disclosed SRIs and carbostyril derivatives may need to be given a different number of times each day.  The '350 patent explains, for example, that aripiprazole generally is prescribed in dosages of either 0.1 to 100 mg once a day or 0.05 to about 50 mg twice a day.  Appx279[12:34-38].  Several SRIs disclosed in the '350 patent, however, such as citalopram or escitalopram, are typically prescribed only for once-a-day use.  Appx279[12:39-60].  If aripiprazole were administered twice a day in combination with once-a-day citalopram, separate dosage forms would be required.  Similarly, the '350 patent discloses compositions of aripiprazole in

11

combination with the SRI venlafaxine, which is generally administered from one to three times a day.  Appx279[12:47-48].  Administering aripiprazole once or twice a day while administering venlafaxine three times a day would also require separate dosage forms of the two drugs.

Consistent with these disclosures, the '350 patent's examples discuss compositions combining aripiprazole with an SRI where the two drugs are administered separately and at different times of day.  Example 6, for example, discloses "[a] combination of aripiprazole and at least one serotonin reuptake inhibitor" for use in treating patients newly diagnosed with major depressive disorder.  Appx286[25:60-62].  In this combination, "[t]he aripiprazole can be administered in one dosage form, for example a tablet, and the serotonin reuptake inhibitor may be administered in a separate one dosage form, for example a tablet." Appx286[26:14-17].  The specification also states that, for the combination in Example 6, "[t]he administration may occur at about the same time or at different times during the day."  Appx286[26:17-18].  Example 8 similarly discloses "[a] combination of dehydroaripiprazole and at least one serotonin reuptake inhibitor" that may be administered either in a single dosage form or in separate dosage forms.  Appx287[27:17-44].  These examples thus both discuss "[a] combination" of aripiprazole and an SRI in which the two drugs may be administered in separate dosage forms, such as in two separate tablets.

Example 9 of the '350 patent also refers to administering separate dosage forms of aripiprazole and an SRI as a "combination" of the two drugs. Appx287[28:26-34].   In Example 9, aripiprazole and the SRI citalopram were suspended in different carrier solutions and each was administered orally to mice. Appx287[28:26-30].   The '350 patent refers to this separate administration of the two drugs as "the combination of aripiprazole with citalopram."   Appx287[28:30-34].

## C.     The '350 Patent Prosecution History

During prosecution of the '350 patent, Otsuka overcame anticipation and obviousness rejections based on U.S. Patent Application Publication No. US 2002/0156067 ("Wong").   *See, e.g.*, Appx4908-4917; Appx6117-6119.   Wong discloses and claims "[a] composition comprising: (a) a pharmaceutically effective amount of one or more norepinephrine reuptake inhibitors [NRIs] or a pharmaceutically effective salt thereof; and (b) a pharmaceutically effective amount of one or more neuroleptic agents or a pharmaceutically effective salt thereof."   Appx6316[claim 1].   Wong's recitation of "[a] composition" includes embodiments in which the two active ingredients are contained in separate dosage forms and also in which they are contained in the same dosage form.   Wong's dependent claim 8, for example, recites that the two active ingredients contained in the single "composition" of claim 1 "are maintained in different delivery vehicles."

13

Appx6316[claim 8]. Claim 7 of Wong, on the other hand, recites that the two active ingredients of claim 1's single "composition" are "maintained in the same delivery vehicle." Appx6316[claim 7].

Otsuka overcame the anticipation rejection by pointing out that Wong does not teach the specific claimed combination of an SRI and aripiprazole. Appx4943-4946; *see also* Appx4970-4977. Otsuka also argued that Wong "fails to include any description or suggestions such that concurrent use of aripiprazole or a metabolite thereof and an SRI (serotonin reuptake inhibitor) exerts an advantageous effect on treatment or improvement for mood disorders." Appx4945.

In response to the obviousness rejection based on Wong, Otsuka submitted two declarations by named inventor Dr. Hirose with data showing that the '350 patent's combinations of aripiprazole with an SRI exhibited unexpectedly superior synergistic effects compared to the compositions disclosed in Wong. Appx4953-4959; Appx6109-6112. Dr. Hirose tested the compositions using the forced swimming test, a well-known experimental animal model used to predict a drug's antidepressant effect. Appx4954; Appx6110. He compared the effect of the compositions disclosed in Examples 1 and 2 of the Wong reference to the effect of six compositions disclosed in the '350 patent comprising aripiprazole with one of six SRIs. Appx4949-4950; Appx4954-4959.

14

In his experiments, Dr. Hirose administered the aripiprazole and SRIs as separate dosages and at different times. Appx4957. He orally administered the SRI one hour before the start of the test and then injected the aripiprazole fifteen minutes before the start of the test. *Id.* The results showed that the compositions comprising aripiprazole and an SRI shortened the immobility time in the forced swimming test, indicating antidepressive effect, whereas the compositions disclosed in Wong did not. Appx4956-4958. Dr. Hirose concluded that "the inventive combination of the present invention" exhibited "synergistic effects which are completely unexpected from Wong et al." Appx4958.

Based on these data, Otsuka noted that "the combination of the present invention has antidepressive effects," whereas "the combinations described in Wong . . . did not significantly shorten the prolonged immobility time in the forced swimming test." Appx4949-4950. Otsuka thus argued that Wong "does not disclose nor suggest the inventive combination or the advantageous effects of the present invention at all." Appx4950.

The U.S. Patent and Trademark Office ("USPTO") eventually allowed the claims following a second declaration from Dr. Hirose, which provided new experimental data showing that the compositions disclosed in Wong did not demonstrate a synergistic antidepressive effect as did those disclosed in the '350 patent. Appx6109-6112; Appx6097-6102; Appx6117-6119. The USPTO based its

15

allowance on Dr. Hirose's two declarations and Otsuka's arguments, and it did not require Otsuka to limit its claims to compositions comprising only a single dosage form.  Appx6118.

During prosecution, Otsuka referred to the invention claimed in the '350 patent as including embodiments in which aripiprazole and the SRI are contained in separate dosage forms.  In Dr. Hirose's first declaration, for example, he conducted testing to demonstrate the "unexpectedly superior effects of *the present invention*," and he referred to administration of separate dosage forms of aripiprazole (injection) and SRI (oral) as "the *present inventive combination*." Appx4953-4954 (emphases added).  Otsuka's response to the USPTO's office action similarly stated that the data in Dr. Hirose's declaration reflecting different routes of administration show "that the combination of the present invention has antidepressive effects."  Appx4949.  Otsuka also described Example 9 of the '350 patent, which involved administering aripiprazole and citalopram in separate dosage forms, as showing the unexpectedly superior results "when citalopram and aripiprazole were used *in combination with* each other," and argued it showed the patentability of "the present invention" over Wong.  Appx4946 (emphasis added); *see also* Appx5002-5003.

Otsuka directly addressed the issue of whether the claims are limited to a single dosage form in response to the USPTO's questions about the data in

Dr. Hirose's first declaration. Appx4976-4977. The examiner noted that the claims did not recite the specific test parameters Dr. Hirose used, such as administering aripiprazole and the SRI "sequentially by different routes of administration" and using specific doses. Appx4976. The examiner also questioned whether the invention "implies a composition comprising both the drugs in a vehicle and not separate drugs in different vehicles." Appx4977. Otsuka responded that the data in the declaration "show[] the synergistic effects of the combination of agents in the present application," Appx5000, and noted that the key aspect of the invention was achieving the desired synergistic pharmacological effect from the combination of drugs, rather than using a particular route of administration or dose strength, Appx5001-5002. Otsuka explained that the combination of drugs Dr. Hirose tested "would exert the same pharmacological effect as long as the drugs are absorbed into the body, irrespective of the route of addition." Appx5002.

Similarly, throughout prosecution, Otsuka described the claimed combination as directed to "concomitant use." *Id.*; *see also* Appx5363-5364 (describing the claimed compositions as involving "concomitant use" of aripiprazole and citalopram or escitalopram). This description reflected Otsuka's understanding that the claimed compositions embody any mode of administration that achieves effective levels of the two drugs in the body at the same time. Otsuka

also submitted several literature references to the USPTO in its first Information Disclosure Statement that mirror Otsuka's description of combination therapy using an SRI and an antipsychotic agent. Appx2784-2807. These references describe "[c]ombination therapy" or "combined treatment" of mood disorders, in which two drugs are administered separately and at separate times. *Id.* (alteration in original).

### D.    The '350 Patent Claims

Claims 1-8 and 17-18 of the '350 patent recite pharmaceutical compositions comprising the atypical antipsychotic agent aripiprazole in combination with at least one SRI. Appx287-288[28:64-29:25]. Claims 9-16 recite methods of treating mood disorders using such compositions. Appx288[29:26-30:48]. The claims are not limited to any particular mode of administration or dosage form, nor are they limited to a composition that is administered as a single dosage form combining the different drugs.

Claim 1 of the '350 patent, for example, recites:

> 1. A pharmaceutical composition comprising (a) aripiprazole in combination with (b) at least one serotonin reuptake inhibitor selected from citalopram, escitalopram and salts thereof.

Appx287[28:64-67].

Claim 9 of the '350 patent recites:

> 9.    *A method of treating a mood disorder* selected from the group consisting of depression of major depressive disorder, dementia with depressive symptoms, major depressive disorder, endogenous depression, melancholia, depression in combination with psychotic episodes, bipolar disorder with depressive phase, refractory depression, dementia of the Alzheimer's type with depressive symptoms, Parkinson's disease with depressive symptoms, senile dementia, mood disorders associated with cerebral blood vessels and mood disorders following head injury in a patient *comprising administration of an effective amount of a pharmaceutical composition* with comprise(s) aripiprazole in combination with (b) at least one serotonin reuptake inhibitor selected from the group consisting of citalopram, escitalopram and salts thereof.

Appx288[29:26-40] (emphases added).

The dependent claims limit the claimed compositions to specific forms of the active and inactive ingredients, and restrict the claimed methods to treating particular mood disorders.  Claim 13, for example, limits the independent method claims to a "pharmaceutical composition [that] further comprises at least one pharmaceutically acceptable carrier."  Appx288[30:22-24].  Claim 5 similarly limits the composition claims to a "composition . . . further comprising at least one pharmaceutically acceptable carrier."  Appx288[29:9-10].

### E.    The District Court's Preliminary Claim Construction

During proceedings on Otsuka's motion for a temporary restraining order ("TRO"), the district court issued a preliminary interpretation of the claim phrases "a/the pharmaceutical composition" and "in combination with."  Appx169-182.  In

19

its briefing, Otsuka noted that the claim language does not limit "the pharmaceutical composition" to a single dosage form. *See, e.g.*, Appx2818-2819. Otsuka also pointed to several disclosures in the '350 patent specification of pharmaceutical compositions in which the carbostyril derivative (e.g., aripiprazole) was in one dosage form while the SRI (e.g., citalopram or escitalopram) was in a separate dosage form. *See, e.g.*, *id.* (citing Appx275[3:53-60]; Appx280[14:17-21]; Appx286[26:15-20]).  Otsuka further noted the '350 patent's teaching that the carbostyril derivative and the SRI may be administered at different times during the day, and thus would necessarily be given as separate dosage forms.  Appx2819 (citing Appx286[26:15-20]).

Defendants, by contrast, urged the district court to interpret the claim language in isolation without consulting the specification, and to discount the specification passages referring to a pharmaceutical composition made up of more than one dosage form.  Defendant Hetero Drugs Limited ("Hetero"), for example, contended that "[a] person of ordinary skill in the art would not have gone beyond Claim 1 to understand its plain and ordinary meaning."  Appx2861.  Hetero also argued that, in each instance where the '350 patent specification discusses a composition made up of more than one dosage form, a skilled artisan would have understood that to refer to alternative, unclaimed embodiments.  Appx2864-2867.  Defendant Apotex Corporation did not address any specification disclosure in its

brief, Appx2757-2760, instead arguing that the proper claim interpretation was "readily apparent" without consulting the specification, Appx2759 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc)).

Defendants also relied on expert declarations that either did not address the specification disclosures of compositions made up of more than one dosage form or contended that those embodiments fell outside the scope of the claims. Dr. Ira Halper, for example, limited his claim-construction analysis solely to the language of claim 1, without any reference to the disclosures in the '350 patent specification and prosecution history of compositions comprising more than one dosage form. Appx2559-2560 ¶¶ 27-32. Indeed, Dr. Halper confirmed during his deposition that, in his analysis, he considered the claim language in isolation, separate from the '350 patent specification:

> [T]he plain meaning of the paragraph in the specifications is the plain meaning of the paragraph in the specifications. The plain meaning of the words in the patent claims is the plain meaning of the words in the patent claims. And ***the fact that there is a difference between what is in the specifications and what is in the patent claims is, as I understand it, not relevant*** for the issue before us today.

Appx2622-2623[43:15-46:17] (emphasis added). He also explained that the goal of his analysis was to interpret the words of the claim without considering what a person of ordinary skill in the art at the time of invention would have understood the '350 patent to disclose. Appx2623[47:5-14].

21

Similarly, Dr. Anthony Palmieri III noted in his declaration that, "in [his] opinion, a person of ordinary skill in the art would not have gone beyond claim 1" to consider the '350 patent specification.    Appx2584 ¶ 32.    Dr. Palmieri purportedly analyzed the '350 patent specification, but his declaration relied exclusively on the portions discussing embodiments in which both active ingredients were combined in a single dosage form.  Appx2584-2590 ¶¶ 33-43.  He concluded that the portions of the specification contradicting his conclusions were irrelevant to the claim-construction analysis, stating that a skilled artisan would have read those disclosures as describing alternatives to the *claimed* compositions. Appx2590-2594  ¶¶ 44-55.    Dr. Palmieri did not consider the '350 patent's prosecution history.  Appx2580 ¶ 17.

Despite the specification's disclosures that the novel compositions of the '350 patent may comprise more than one dosage form, the district court construed the claims as limited to "a single dosage form, or 'pharmaceutical composition,' containing at least two active ingredients: (a) aripiprazole and (b) at least one of citalopram, escitalopram and salt thereof."    Appx181-182.  The court equated "a pharmaceutical composition" with "a single dosage" form, and based its preliminary construction largely on its determination that "a pharmaceutical composition" is a singular noun.  Appx173-174 (emphasis in original).  The court reasoned that this "provide[d] a clear indication that the claim refers to a single

22

pharmaceutical <u>composition</u>," and thus inferred that the claim must also be limited to a single dosage form comprised of multiple active pharmaceutical ingredients. Appx173 (emphasis in original).

The court further stated that, "given the grammatical structure and use of commonly understood terms, a lay person would immediately understand that '[a] pharmaceutical <u>composition</u>' comprised of '<u>(a)</u>' and '<u>(b)</u>' means that the claimed 'composition' requires a single dosage of the identified ingredients."  Appx173-174.  Similarly, the court relied on a sentence in the specification describing the "pharmaceutical composition of the present invention" as comprising a first ingredient and a second ingredient "in a pharmaceutically acceptable carrier." Appx276[6:47-51].  Based on this sentence, the court reasoned that the claimed composition could only have a single pharmaceutically acceptable carrier, Appx176-177, despite the disclosure in the specification that the "novel compositions of [the] present invention" include embodiments where an SRI and a carbostyril derivative are in separate dosage forms, "***each*** in a pharmaceutically acceptable carrier," Appx275[3:52-60] (emphasis added).

In its analysis, the court selectively quoted from the '350 patent specification but added the word "single" in several places to support its conclusion that the claimed "pharmaceutical composition" must be a single dosage form.  The court, for example, inserted the word "single" when discussing the '350 patent's Detailed

23

Description of the Invention, stating that the specification "describes in detail the 'first' and 'second' ingredients, 'contained,' 'combined,' or 'mixed' in the ***single*** 'pharmaceutical composition.'" Appx176 (emphasis added) (quoting Appx276[6:47-55]; Appx278[10:52-57]; Appx279[11:47-48]). The court similarly added the word "single" when quoting from the '350 patent's abstract, describing the invention as "a 'pharmaceutical composition' comprised of '(1) a carbostyril derivative,' either 'aripiprazole or a metabolite,' together with '(2) a serotonin reuptake inhibitor,' e.g., citalopram and/or escitalopram, 'in a **[*single*]** pharmaceutically acceptable <u>carrier</u>.'"[1] Appx175-176 (alteration in original) (first emphasis added) (quoting Appx262[abstract]). The word "single" does not appear in these portions of the specification.

The district court also based its interpretation on claim 18 of the '350 patent, a dependent claim which recites:

> 18. The composition of claim 1, wherein the amount of (a) aripiprazole in combination with (b) at least one serotonin reuptake inhibitor selected from citalopram, escitalopram and salts thereof is 1 to 70 parts by weight of the total composition.

---

[1] In contrast to the court's addition of the word "single" when discussing "a [single] pharmaceutically acceptable <u>carrier</u>," dependent claims 5 and 13 of the '350 patent limit the claimed compositions to "***at least one*** pharmaceutically acceptable carrier." Appx288[29:9-10] (emphasis added); Appx288[30:22-24].

Appx288[30:44-48].   As it did with claim 1, the court interpreted claim 18 as limited to a single dosage form despite the lack of such a limitation in the claim language itself.   Appx174-175 (citing Appx288[30:44-48]).   Although the court noted that "Claim 18 recites subject matter admittedly narrower than Claim 1," it nevertheless concluded that this "disclosure of a specific ingredient ratio explicitly teaches that Claim 1's 'pharmaceutical composition' necessarily occurs in a single dosage format."  Appx175.

Although the district court stated that it considered the '350 patent specification as a whole, it gave weight only to the portions describing embodiments in which the SRI and carbostyril derivative are contained in a single dosage form.  Appx175-178; Appx181-182.  The court explained that the claimed composition "requires no complex construction," and that "the limited claim language leaves little to the imagination, and requires no more than 'the application of the widely accepted meaning of commonly understood words.'"   Appx172 (quoting *Phillips*, 415 F.3d at 1314).  Based on its conclusion about how a "lay person" would interpret the plain meaning of the claim language, Appx173-174, divorced from the specification, the court ignored embodiments in the specification disclosing multiple dosage forms as irrelevant to the claims because they conflicted with its interpretation of the claim, Appx175-178; Appx181.

For example, although the court cited several portions of the specification describing "the pharmaceutical composition of the present invention" as comprising *either* a single dosage form or more than one dosage form, it discounted the disclosure of multiple dosage forms as allegedly relating to unclaimed, alternative embodiments. Appx179-181 (citing Appx280[14:17-21]). The court concluded, for example, that the following disclosure of an embodiment with multiple dosage forms was intended merely to provide a contrast to the claimed compositions, which the court held are limited to a single dosage form:

> *The novel compositions of [the] present invention* comprising at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and at least one serotonin reuptake inhibitor in a pharmaceutically acceptable carrier *may be combined in one dosage form, for example a pill. Alternatively* the at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and the at least one serotonin reuptake inhibitor *may be in separate dosage forms, each in a pharmaceutically acceptable carrier. These compositions are administered to a patient with a mood disorder*, particularly depression or major depressive disorder, in an amount and dosage regimen effective to treat the mood disorder.

Appx275[3:52-64] (emphases added); Appx179-180 (citing Appx275[3:52-60]). Similarly, although the court itself quoted three portions of the specification describing the claimed compositions as including more than one dosage form, the court criticized Otsuka's citation of these passages as an attempt to "cherry pick portions of the specification to support its argument." Appx178. After excluding

each disclosure of multiple dosage forms in the specification, the court concluded that "the amount of intrinsic evidence that consistently discloses that Claim 1 refers to a single dosage form can hardly be described as anything less than substantial." Appx181.

### F. *Markman* Proceedings and the District Court's Final Claim Construction

After denying Otsuka's motion for a TRO, the district court conducted claim-construction proceedings to formally interpret the claim phrases "a/the pharmaceutical composition" and "in combination with." Appx125-133. Both Otsuka and the defendants submitted briefs and expert declarations addressing these terms, and the court held a *Markman* hearing, during which the parties' experts testified. Appx83 & n.4. Although the court considered the additional evidence and arguments, and found that "the undisputed extrinsic reality" supported Otsuka's proposed construction, Appx131-132, the court's *Markman* opinion largely reiterated its previous (preliminary) construction and relied only on portions of the intrinsic record, Appx125-126.

### 1. Intrinsic Evidence

During claim construction, Otsuka again pointed out that the plain claim language does not limit "a pharmaceutical composition" to a single dosage form. Appx2312-2313. Otsuka also noted that claim terms are to be read not only in the context of the claim itself, but also in the context of the entire patent, including the

specification.  Appx2297 (citing *Phillips*, 415 F.3d at 1313).  Accordingly, Otsuka again cited the numerous disclosures and examples in the specification in which the claimed compositions include an SRI and carbostyril derivative in ***separate*** dosage forms.  Appx2312-2315.

Otsuka also specifically addressed the argument in defendants' TRO briefs that the '350 patent specification disclosed embodiments with more than one dosage form *only as alternatives* to the claimed compositions, an argument the district court endorsed in its preliminary claim construction.  *See, e.g.*, Appx2864-2867; *see also* Appx180-181.  Otsuka noted that the specification described such embodiments as alternative embodiments of "[t]he novel **compositions** of [the] present invention" and of the "[a]dministration forms of the pharmaceutical composition of the present invention."  Appx2313-2314 (first quoting Appx275[3:52-64]; and then quoting Appx280[14:10-21]).  Otsuka pointed out, for example, that when the specification discusses "[t]he novel **compositions** of [the] present invention," it teaches both single-dosage-form and multiple-dosage-form embodiments, and then refers to *both* embodiments as being "compositions [that] are administered to a patient [with a mood disorder]."  Appx2313 (quoting Appx275[3:52-64]).  Otsuka thus explained that the defendants' argument had no basis in the language of the specification.  *Id.*

Otsuka also argued that the '350 patent's prosecution history, which neither of defendants' experts considered, supported its proposed construction. Otsuka noted, for example, that Dr. Hirose's March 2009 declaration referred to administration of aripiprazole and an SRI in separate dosage forms as "the combination of agents in the present application." Appx2316-2317 (quoting Appx5000). Otsuka also pointed to its statements during prosecution characterizing Example 9 of the '350 patent, which involved administering separate dosage forms of aripiprazole and an SRI, as showing the synergistic effects of "the combination" of the "present invention." Appx2315-2316 (citing Appx4771).

As it did in its TRO opinion, however, the court again limited the '350 patent claims to single dosage forms based largely on its determination that the claims use "a pharmaceutical composition" as a singular noun. Appx127-128. The court reasoned that this, together with the language "in combination with," provided "a clear indication that the asserted claims of the '350 Patent refer to a single pharmaceutical composition or dosage comprised of multiple active pharmaceutical ingredients." Appx128. The court thus equated the concept of a single "pharmaceutical composition" with a requirement that the composition use only a single dosage form, assuming that a single composition with two ingredients could only exist in a single dosage form. *Id.*

In support of this interpretation, the court relied solely on the portions of the '350 patent specification discussing embodiments in which the two active ingredients are contained in a single dosage form. Appx128-131. And, as it did in its preliminary claim construction, the court again inserted the word "single" when quoting from the specification to bolster its conclusion that the claims should be limited to a single dosage form. Appx129. In a footnote, the court reiterated the reasoning from its TRO opinion that the portions of the specification discussing embodiments in which the pharmaceutical composition includes more than one dosage form are no more than "alternative embodiments" that fall outside the scope of the claim term "pharmaceutical composition." Appx131 n.55. The district court did not address Otsuka's statements in the '350 patent's prosecution history characterizing administration of separate dosage forms of aripiprazole and an SRI as embodiments of the claimed invention.

### 2. Extrinsic Evidence

Although the district court did not rely on any extrinsic evidence in construing the claims, it did make a finding based on the parties' expert testimony that "the undisputed extrinsic reality [was] that psychiatrists do not, as a practical matter, prescribe single dosage forms of antipsychotics and antidepressants." Appx131-132. Instead, the court found, "psychiatrists prefer to engage in combination therapy, i.e., to prescribe an antipsychotic in a separate dosage form

from the antidepressant, in order to have the ability to titrate the dosages based upon the individual reactions of certain patients." Appx132. The court based this conclusion both on testimony by Otsuka's clinical expert, Dr. Correll, and on admissions by defendants' expert, Dr. Halper. Appx131-132 (citing Appx2035-2036[36:6-37:11]; Appx2103-2104[104:9-105:7]; Appx2376 ¶ 22; Appx6329[44:17-24]).

Dr. Correll, a psychiatrist with over twenty years of experience in the field, opined that a person of ordinary skill in the art at the time of invention would have interpreted the disputed claim language as including situations where aripiprazole and an SRI are combined in separate dosage forms. Appx2376 ¶ 22. In addition to highlighting the sections of the '350 patent specification discussing compositions comprising more than one dosage form, Dr. Correll also stated that a person of ordinary skill in the art would understand the compositions of the '350 patent to cover multiple dosage forms because that is how the drugs would actually be prescribed to patients. He explained, for example, that a clinician prescribing more than one drug to treat a mood disorder would typically do so using separate dosage forms so the dose of both drugs could be adjusted independently. Appx2035[36:6-13].

Dr. Correll also stated that it is important for clinicians to be able to instruct certain patients to take medications at different times during the day based on

possible side effects.  Appx2379 ¶ 31.  He noted that SRIs such as citalopram or escitalopram may cause drowsiness that could inhibit a patient's daytime activities, while aripiprazole may make it difficult for some patients to sleep at night.  *Id.*; *see also*  Appx2034-2036[35:13-37:11];  Appx2218-2222[219:8-223:22].  Dr. Correll pointed to the disclosure in the '350 patent specification that the carbostyril derivative and SRI may be given in separate dosage forms and at different times of day.  Appx2378 ¶ 29 (citing Appx280[14:17-21]).

During the *Markman* hearing, defendants' expert, Dr. Halper, similarly testified that, in his clinical psychiatry practice, he starts patients at the lowest dose he thinks may be effective and adjusts it based on the patient's response. Appx2114[115:3-10].  Dr. Halper admitted that combining aripiprazole and an SRI into a single dosage form, such as a tablet, would make it impossible to titrate the dosage of the drugs.  Appx2114[115:11-14].  Dr. Halper also admitted that the '350 patent specification discloses several embodiments in which the pharmaceutical composition includes aripiprazole and an SRI in separate dosage forms and in which the drugs are administered at different times of day. Appx2104-2111[105:13-112:21].

## G.    The District Court's Grant of Summary Judgment of Noninfringement

Based on the court's construction of the claim language "a/the pharmaceutical composition" and "in combination with," Otsuka and the

defendants in eleven of the underlying district court cases stipulated to summary judgment of noninfringement as to the '350 patent.  Appx1-5; Appx6-10; Appx11-16; Appx17-21; Appx22-26; Appx27-31; Appx32-36; Appx37-42; Appx43-47; Appx48-52; Appx53-57.  In the other three underlying actions, which involved only the '350 patent, the district court granted Otsuka's motion for summary judgment of noninfringement and dismissed the corresponding counterclaims.  Appx58-59; Appx60-61; Appx62-63; Appx64-71.  The court then granted Otsuka's unopposed motions for certification of the stipulated judgments of noninfringement pursuant to Fed. R. Civ. P. 54(b) and dismissed defendants' counterclaims concerning the '350 patent.  These consolidated appeals followed.

## IV.    SUMMARY OF THE ARGUMENT

The district court erred by construing "a/the pharmaceutical composition" and "in combination with" as limiting the claims to compositions containing aripiprazole and an SRI in one dosage form.  The plain language of the claims does not restrict the novel compositions to a single dosage form or to any particular mode of administration.  Yet the court erroneously concluded that, because the claim recites "a pharmaceutical composition" as a singular noun, the claims therefore must be limited to a single dosage form.  It based this conclusion on its interpretation of the claims from the viewpoint of a "lay person," and it failed to

analyze the claim language in the context of the patent specification and prosecution history.

After concluding that a singular "composition" is inherently limited to a single dosage form, the court considered only the parts of the specification that supported this conclusion. It thus ignored the numerous disclosures in the intrinsic record of compositions comprising more than one dosage form. The '350 patent teaches, for example, that the "novel compositions of [the] present invention" may combine aripiprazole and an SRI in one dosage form or, alternatively, the two drugs "*may be in separate dosage forms*, each in a pharmaceutically acceptable carrier." Appx275[3:52-64] (emphasis added). The specification also discloses that the key aspect of the '350 patent is the synergistic results obtained by administering aripiprazole in combination with an SRI, and that this result can be obtained in any way that achieves effective levels of both drugs at the same time.

Furthermore, six of the nine examples in the '350 patent (Examples 3, 5, 6, 7, 8, and 9) disclose compositions comprising separate dosage forms of aripiprazole and an SRI. Examples 6 and 8 expressly state that "aripiprazole can be administered in one dosage form, for example a tablet, and the serotonin reuptake inhibitor may be administered in a *separate dosage form*, for example a tablet." Appx286[26:14-17] (emphasis added); Appx287[27:37-40]. Examples 5 and 7 discuss "augmentation therapy," in which a patient who is already taking an

SRI adds aripiprazole to his or her treatment regimen, suggesting separate dosage forms. Appx286[25:26-30]; Appx286[26:47-51]. Examples 3 and 9 describe administration of aripiprazole and an SRI in separate dosage forms, and refer to this as "combination administration." Appx283[20:26-33]; Appx287[28:26-34]. Defendants' expert, Dr. Halper, conceded that Examples 5, 6, 7, 8, and 9 disclose a composition with separate dosage forms of aripiprazole and an SRI.

The court erred by excluding these embodiments, which the court concluded were inconsistent with its "lay person" interpretation of the claim language. The court reasoned that the '350 patent's disclosures and examples of compositions with separate dosage forms were merely alternative embodiments that are not covered by the claims.

The court further erred by failing to analyze the '350 patent's prosecution history, which shows Otsuka's consistent use of the term "composition" to refer to administration of aripiprazole and an SRI in separate dosage forms. Throughout prosecution, Otsuka consistently characterized "the present invention" as including compositions in which aripiprazole and the SRI are administered in separate dosage forms and at separate times. Moreover, named inventor Dr. Hirose stated that administration of separate dosage forms of aripiprazole and an SRI showed that "the combinations of the present invention . . . have synergistic effects" compared to the prior art. Appx4959.

The court based its claim construction only on portions of the intrinsic record, but it nonetheless found that the extrinsic record established that psychiatrists prefer to engage in combination therapy, prescribing separate dosage forms of the antipsychotic and antidepressant to allow for independent adjustment of the dosages of both drugs.  The court credited the testimony of Otsuka's expert, Dr. Correll, who stated that clinicians typically treat mood disorders by prescribing an antidepressant first and then adding another drug, such as aripiprazole, if the patient does not show a sufficient response.  Defendants' expert, Dr. Halper, conceded that this is customary in clinical practice, and that using a single dosage form containing both drugs would make this adjustment impossible.  Dr. Correll also testified that a person of ordinary skill in the art would interpret the '350 patent in the context of the specification and prosecution history, and thus would conclude that the claimed "pharmaceutical composition" includes embodiments with separate dosage forms.  Defendants' experts, Dr. Halper and Dr. Palmieri, failed to analyze the full intrinsic record or to consider the claim language in the proper context, and thus their testimony regarding the claims' meaning should be given no weight.

This Court should reject the district court's erroneous claim construction, which conflicts with the intrinsic record and incorrectly excludes compositions that contain aripiprazole and the SRI in separate dosage forms.  The Court therefore

36

should reverse the district court's entry of summary judgment of noninfringement and remand for further proceedings.

## V.  LEGAL STANDARDS

This Court reviews the district court's claim construction de novo and any underlying factual determinations concerning extrinsic evidence for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).  When a district court bases its claim construction exclusively on intrinsic evidence, "the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*."  *Id.* at 841.  In cases where subsidiary facts regarding extrinsic evidence are in dispute, however, a district court "will need to make subsidiary factual findings about that extrinsic evidence," and that "factfinding must be reviewed for clear error on appeal."  *Id.*

Words of a patent claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips*, 415 F.3d at 1312-13.  This Court has explained, however, that one "cannot look at the ordinary meaning of the term . . . in a vacuum."  *Id.* at 1313 (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)).  Instead, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the

entire patent, including the specification." *Id.* This context is important because patentees sometimes "use terms idiosyncratically," and the Court therefore must look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Courts may rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc)). In particular, "expert testimony can be useful to a court . . . to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318.

## VI.   ARGUMENT

### A.   The District Court Erred in Construing the Claim Terms "a/the Pharmaceutical Composition" and "in Combination with" as Limited to a Single Dosage Form

#### 1.   The Plain Language of the Claims Does Not Limit a "Pharmaceutical Composition" to a Single Dosage Form

The plain language of the '350 patent claims does not limit the "pharmaceutical composition" to a single dosage form, and the district court thus erred by reading in this limitation.   The claims recite a "pharmaceutical composition" comprising aripiprazole or its metabolite "in combination with" at least one SRI, but they do not specify that the two active ingredients must be in the same dosage form.   *See, e.g.*, Appx287[28:64-67].   Nor does the claim language restrict this composition to "any method of administration, particular molecular structure, nor any method of use," as the district court recognized.   Appx173.

The district court nonetheless erroneously concluded that, because the claim term "pharmaceutical composition" was singular, it must ***necessarily*** be limited to a single dosage form containing both active ingredients.   Appx181-182; Appx127-128.   The court reasoned that the use of "a pharmaceutical <u>composition</u>," followed by "in combination with," was a "clear indication that the asserted claims of the '350 Patent refer to a <u>single</u> pharmaceutical <u>composition</u> or dosage comprised of multiple active pharmaceutical ingredients."   Appx128.   The parties' disagreement

39

regarding the claim term "a/the pharmaceutical composition," however, did not involve whether the term *itself* was a singular noun. The claim-construction issue was instead whether the disputed claim term—"*a/the* pharmaceutical composition," in the singular—is limited to a single dosage form. The question whether "pharmaceutical composition" is singular does not resolve this issue, and therefore the court's focus on this point was erroneous.

The district court further erred by conducting its grammatical analysis of the claim based on how "a lay person" would interpret the language. In its preliminary claim construction, the court explained that, based on "the grammatical structure and use of commonly understood terms, *a lay person* would immediately understand that '[a] pharmaceutical composition' comprised of '(a)' and '(b)' means that the claimed 'composition' requires a single dosage of the identified ingredients." Appx173-174 (emphasis added). The court similarly stated that the disputed claim language "requires no complex construction," Appx172, and it thus rendered what it called a "commonsense, plain language construction" with no analysis of how a person of ordinary skill in the art would have interpreted the disputed claim language, Appx174.

The court's analysis reflects two distinct errors. First, the court erred by analyzing the claim from a lay perspective rather than based on the understanding of a person of ordinary skill in the art at the time of invention. *Phillips*, 415 F.3d at

1313.  Second, the court further erred by conducting this "lay person" analysis of the claim language in isolation, without considering the context of the specification and prosecution history.  As discussed below, after reaching a conclusion about the claim based on its determination that "composition" is singular, the court considered only specification language that supported this conclusion and ignored contrary disclosures of compositions comprising more than one dosage form.

The court also erred by concluding that claim 1 should be limited to a single dosage form based on the language of dependent claim 18, which recites the composition of claim 1 "wherein the amount of (a) aripiprazole in combination with (b) at least one [SRI] . . . is 1 to 70 parts by weight of the total composition." Appx288[30:44-48].  Claim 18 is not limited to a single dosage form, and thus it does not limit the broader, independent claims to a single dosage form.  Moreover, the district court conceded that claim 18 is "admittedly narrower than Claim 1," seemingly recognizing that, even if claim 18 *were* limited to a single dosage form, this limitation would not necessarily apply to claim 1.  Appx174-175.  The court thus erred by concluding that "Claim 18's disclosure of a specific ingredient ratio explicitly teaches that Claim 1's 'pharmaceutical composition' *necessarily occurs* in a single dosage format."  Appx175 (emphasis added).

The district court further erred by concluding that independent claim 9 does not support Otsuka's proposed claim construction.  Claim 9 recites "a

41

pharmaceutical composition which comprise(s)" aripiprazole and at least one SRI, where the plural or singular nature of "comprise(s)" indicates that the composition can mean either a single dosage form or more than one dosage form. Appx288[29:26-40]. The court concluded, however, that it was "clear that the patentee intended the '(s)' to be '(a).'" Appx126-127 n.54. In other words, the court speculated that the patentee intended to claim "a pharmaceutical composition which comprise (a) aripiprazole in combination with (b) at least one [SRI]." The court thus concluded that the claim was limited to a single dosage form. Appx126-127 n.54. Yet this speculative reading of claim 9 still suggests that the pharmaceutical composition comprises multiple dosage forms that "comprise[]" the two active ingredients. The court erred by relying heavily on its determination that "composition" is a singular noun but discounting claim 9's implicit reference to multiple dosage forms.

### 2.    The District Court Erred by Ignoring the Intrinsic Record's Teachings That the Claimed Pharmaceutical Composition May Include Multiple Dosage Forms

After concluding that a singular "pharmaceutical composition" necessarily is limited to a single dosage form, the district court selectively cited portions of the specification discussing compositions comprising a single dosage form. Appx175-178; Appx128-131. The district court also inserted the word "single" into quoted language from the '350 patent to support its construction. Appx175-176 (citing

Appx262[abstract]);   Appx276[6:47-55];   Appx278[10:52-57];   Appx279[11:47-48]).

The court was wrong, however, when it stated that the '350 patent "consistently and repeatedly teaches that the claimed invention concerns a single dosage form, comprised of two active ingredients." Appx128. On the contrary, Otsuka cited numerous disclosures in the specification and discussion in the prosecution history about compositions where aripiprazole and the SRI are in separate dosage forms and are administered at different times. *See, e.g.*, Appx2716-2717; Appx2818-2819; Appx2312-2317; Appx2355-2360. Moreover, the '350 patent uses the terms "composition" and "compositions" interchangeably to refer to the claimed compositions. The specification states, for example, that "[t]reatment comprises administration of the ***compositions*** of the present invention to a patient with a mood disorder such as depression or major depressive disorder, in an amount and dose regimen effective to treat the mood disorder." Appx279[12:18-25]. Because the district court had already concluded that the claims were limited to a single dosage form based on its "lay person" review of the claim language, however, it improperly dismissed these disclosures as irrelevant.

###### a.    The '350 Patent Specification Repeatedly Teaches Pharmaceutical Compositions Comprising Aripiprazole and the SRI in Separate Dosage Forms

The district court erred by ignoring the numerous teachings in the '350 patent of compositions comprising more than one dosage form. The patent teaches, for example:

> ***The novel compositions of [the] present invention*** comprising at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and at least one serotonin reuptake inhibitor in a pharmaceutically acceptable carrier ***may be combined in one dosage form***, for example a pill. ***Alternatively*** the at least one carbostyril derivative with activity as a dopamine-serotonin system stabilizer and the at least one serotonin reuptake inhibitor ***may be in separate dosage forms, each in a pharmaceutically acceptable carrier***. These compositions are administered to a patient with a mood disorder, particularly depression or major depressive disorder, in an amount and dosage regimen effective to treat the mood disorder.

Appx275[3:52-64] (emphases added). This passage states that the "novel compositions of [the] present invention" may ***either*** be combined in one dosage form or, alternatively, may be in separate dosage forms.

The '350 patent contains similar teachings in Examples 6 and 8, which discuss using "[a] combination of aripiprazole [or dehydroaripiprazole] and at least one serotonin reuptake inhibitor" as a therapy for depression. Appx286[25:60-62]; Appx287[27:17-20]. These examples expressly state that the "aripiprazole can be administered in one dosage form, for example a tablet, and the serotonin reuptake

44

inhibitor may be administered in a ***separate one dosage form***, for example a tablet." Appx286[26:14-17] (emphasis added); Appx287[27:37-40]. The examples further state that "[t]he administration may occur at about the same time or at different times during the day." Appx286[26:17-18]; Appx287[27:40-41]. The examples disclose that "[t]he aripiprazole [or dehydroaripiprazole] is ***administered together with*** at least one serotonin reuptake inhibitor," despite their teaching that the two drugs can be administered in separate dosage forms and at separate times during the day. Appx286[26:7-11] (emphasis added); Appx287[27:32-36]. Defendants' expert, Dr. Halper, admitted that aripiprazole (or dehydroaripiprazole) and the SRI can be administered in separate dosage forms and at different times of day in both Examples 6 and 8. Appx2109-2111[110:5-112:5].

The court misinterpreted these specification passages when it concluded that they relate only to unclaimed, alternative embodiments. Appx180; Appx131 n.55. The portion of the specification discussing "the compositions of the present invention" discloses that a composition with aripiprazole and an SRI in separate dosage forms is an alternative embodiment ***of the present invention***, not an alternative ***to the present invention***. This can be seen in the specification's discussion of the "novel compositions of [the] present invention." Appx275[3:52-64]. The specification states that "[t]hese compositions are administered to a

patient," referring to *both* the single-dosage-form composition or the separate-dosage-form composition.  Appx275[3:60-64].

The court similarly erred by concluding that the disclosure of separate dosage forms in Examples 6 and 8 relates only to unclaimed, alternative embodiments.  Appx180.  Notably, both examples state *first* that the composition may have *separate dosage forms* of aripiprazole and the SRI, and then *later* states that, "[a]lternatively, a dosage form containing aripiprazole in combination with at least one serotonin reuptake inhibitor may be administered."  Appx286[26:14-21].  Thus, to the extent that using the word "alternatively" indicates an embodiment falling outside the claimed compositions, the '350 patent describes both single-dosage-form and separate-dosage-form embodiments using that language.  Accordingly, there is no support for the court's determination that only the separate-dosage-form embodiments are unclaimed alternatives.

The court's construction limiting the claims to a single dosage form also ignores the specification's teaching that the key requirement for achieving the unexpectedly synergistic effect of using aripiprazole in combination with an SRI is to generate effective plasma levels of both drugs at the same time, regardless of dosage form.    Appx280[14:9-12].    The '350 patent explains that the "[a]dministration forms of the pharmaceutical composition of the present invention may be any type by which the effective levels" of both aripiprazole and SRI are

46

achieved in vivo at the same time. Appx280[14:9-12]. The court, however, discounted the '350 patent's express teaching that this can be done either by using a single dosage form containing both aripiprazole and the SRI or by administering separate dosage forms of the two drugs at different times. Appx280[14:12-20]. The patent states, for example:

> In one embodiment, a carbostyril derivative together with a serotonin reuptake inhibitor are contained in one pharmaceutical composition and this composition may be administered. On the other hand, ***each one of carbostyril derivative and a serotonin reuptake inhibitor are contained individually in a pharmaceutical preparation respectively***, and each one of these preparations may be administered at the same time or in suitable intervals.

*Id.* (emphasis added). The court erred by dismissing this express teaching of achieving the synergistic effects of the claimed invention using separate dosage forms.

The court also failed to give any weight to the specification's disclosure that aripiprazole may be taken a different number of times each day and at different times from the SRI, thus requiring separate dosage forms. The '350 patent teaches that aripiprazole generally is prescribed in dosages of either 0.1 to 100 mg once a day or 0.05 to about 50 mg twice a day. Appx279[12:34-38]. The SRIs citalopram and escitalopram, however, are typically taken only once each day. Appx279[12:39-60]. As defendants' expert, Dr. Halper, admitted, if aripiprazole

47

were prescribed for twice-a-day use in combination with once-a-day citalopram, separate dosage forms would be required.  Appx2106-2107[107:16-108:2].

Similarly, the court improperly discounted the '350 patent's description of embodiments in which a patient who is already taking an SRI begins taking aripiprazole, which the patent describes as "augmentation therapy."  Examples 5 and 7, for example, disclose adding aripiprazole as part of "***augmentation therapy*** in depressed patients with major depressive disorder who were previously non-responsive or partially responsive to anti-depressant medication comprising serotonin reuptake inhibitors."  Appx286[25:26-30] (emphasis added); *see also* Appx286[26:47-51].  In these examples, patients who were already taking an SRI began taking aripiprazole, indicating that the two drugs are given as separate dosage forms.  Appx286[25:26-30]; *see also* Appx286[26:47-51].  Dr. Halper admitted that both Examples 5 and 7 describe embodiments in which aripiprazole is being administered separately from the SRI.  Appx2108-2109[109:1-110:4].

Finally, the court ignored Examples 3 and 9 of the '350 patent, which describe administration of aripiprazole and an SRI in separate dosage forms as using aripiprazole "in combination together with" the SRI or as "combination administration."  Appx283[20:26-33].  Example 3 discusses the results of a forced swimming test that compared the antidepressive effects of combinations of aripiprazole and an SRI to the effects of using each agent alone.  Appx283[20:27-

48

33].   During prosecution, Otsuka explained that Example 3 "employ[ed] the same steps[,] materials and conditions" as the forced swimming test described in the first declaration inventor Dr. Hirose submitted to the USPTO to establish the claimed composition's unexpectedly superior results.   Appx4943.   In that testing, aripiprazole and the SRI were administered using separate dosage forms and different modes of administration.  Appx4955-4956.  Aripiprazole was dissolved in 0.1% acetic acid-saline and administered by intraperitoneal injection fifteen minutes before the start of the test.  *Id.*  The SRIs were suspended or dissolved in 5% gum arabic-distilled water and orally administered sixty minutes before the start of the test.  Appx4955.

Example 9 similarly discloses data showing the antidepressive effects of "the combination of aripiprazole with citalopram," but this time in a "tail suspension test."[2]  Appx287[28:30-34].  As Dr. Halper admitted, aripiprazole and the SRI citalopram were administered in separate dosage forms in Example 9. Appx2107[108:5-25].  Aripiprazole was suspended in a carrier solution of 0.5% gum arabic and 0.9% saline, while citalopram was dissolved in a 0.9% saline solution.    Appx287[28:26-28].    The '350 patent nonetheless describes this

---

[2] The tail suspension test, similar to the forced swimming test, is widely used as an experimental animal model for predicting the antidepressant effect of a test drug.  Appx287[28:8-14].

administration as "the combination of aripiprazole with citalopram." Appx287[28:30-34].

The numerous disclosures of using separate dosage forms are not, as the district court stated, merely "isolated portions of the specification" that may be discounted when construing the claims.  Appx131 n.55.  Nor did Otsuka "cherry pick portions of the specification to support its argument."  Appx178.  On the contrary, Otsuka's construction accounts for all of the '350 patent's disclosure, including its discussion of embodiments with a single dosage form and embodiments where aripiprazole and the SRI are in separate dosage forms.  Nor do these specification passages "'contradict' the relevant claim language," Appx131 n.55, which does not restrict "pharmaceutical composition" to a single dosage form and is entirely consistent with Otsuka's proposed construction.

Based on the patent's disclosure of numerous embodiments comprising separate dosage forms, a person of ordinary skill in the art at the time of invention would have understood "a/the pharmaceutical composition" and "in combination with" to include compositions where aripiprazole and the SRI are contained in separate dosage forms.  The district court thus erred by dismissing these disclosures and construing the claims as limited to a single dosage form.

As this Court has held, a claim interpretation that excludes a preferred embodiment "is rarely, if ever, correct."  *Vitronics Corp. v. Conceptronic, Inc.*,

90 F.3d 1576, 1583 (Fed. Cir. 1996).  Indeed, "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Innova/Pure Water*, 381 F.3d at 1117 (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).  Here, there are only two embodiments relating to dosage forms—single-dosage-form compositions and separate-dosage-form compositions—and the court erred by excluding one of these two embodiments.

**b.  The '350 Patent's Prosecution History Also Shows That the Claims Cover Compositions Comprising More Than One Dosage Form**

The district court failed to consider the '350 patent's prosecution history in its *Markman* ruling.  The court thus did not address Otsuka's argument that the prosecution history provides additional intrinsic evidence that the claimed compositions are not limited to a single dosage form.

Throughout prosecution of the '350 patent, Otsuka consistently characterized administration of separate dosage forms of aripiprazole and an SRI as falling within the scope of the claimed compositions.  For example, Otsuka stated that the tail suspension test in Example 9, which involved administering aripiprazole and citalopram in separate dosage forms, showed the unexpectedly

51

superior results "when citalopram and aripiprazole were used *in combination with each other.*"  Appx4946 (emphasis added); *see also* Appx4771; Appx5002-5003. Otsuka argued that these data showed the patentability of "*the present invention*" over Wong.  Appx4946 (emphasis added); *see also* Appx5002-5003.  Otsuka also repeatedly described the claimed invention as involving "concomitant use" of aripiprazole and an SRI, indicating that the two drugs could be administered in separate dosage forms and even at separate times of day.  *See, e.g.*, Appx5002-5003; Appx5363-5364.

Likewise, named inventor Dr. Hirose characterized the claimed invention as covering compositions comprising more than one dosage form in the two declarations he submitted to the USPTO.  Dr. Hirose discussed data from a forced swimming test, which showed that the '350 patent's combinations of aripiprazole with an SRI exhibited unexpectedly superior synergistic effects compared to the compositions disclosed in Wong.  Appx4953-4959; Appx6109-6112.  He administered separate dosages of aripiprazole and an SRI, orally administering the SRI one hour before the start of the test and then injecting the aripiprazole fifteen minutes before the start of the test.  Appx4957.  Defendants' expert, Dr. Palmieri, recognized that Dr. Hirose administered the two drugs at different times and used different dosage forms.  Appx2683-2684[195:11-198:6].  Dr. Hirose described this administration as "the present inventive combination."  Appx4954.

52

Both Otsuka and Dr. Hirose stated that these results showed the benefits of the claimed invention, evidencing their understanding that the claimed "composition" is not limited to a single dosage form.  Dr. Hirose, for example, concluded that the data showed the superiority of "the inventive combination of the present invention" over "the combinations described in Wong."  Appx4958.  He further stated that "the combinations of the present invention . . . have synergistic effects unexpected from the specific combination disclosed in Wong."  Appx4959.  Otsuka similarly explained that data show "the combination of the present invention has antidepressive effects," whereas "the combinations described in Wong . . . did not significantly shorten the prolonged immobility time in the forced swimming test."  Appx4949-4950.  Otsuka thus argued that Wong "does not disclose nor suggest the inventive combination or the advantageous effects of the present invention at all."  Appx4950.

Otsuka again demonstrated its understanding that the claimed compositions are not limited to a single dosage form in response to the USPTO's questions about the data in Dr. Hirose's first declaration.    Appx4976-4977.    The examiner specifically asked whether the invention "implies a composition comprising both the drugs in a vehicle and not separate drugs in different vehicles."  *Id.*  Otsuka responded that Dr. Hirose's declaration "shows the synergistic effects of the combination of agents in the present application."  Appx5000.  Otsuka also noted

that the key aspect of the invention was achieving the desired synergistic pharmacological effect from the combination of drugs, rather than using a particular route of administration or dose strength.  Appx5001-5002.

The prosecution history also shows that Otsuka's use of the term "pharmaceutical composition" to refer to compositions with more than one dosage form is consistent with the term's use in the art.  Wong, for example, claims "[a] composition" with two active ingredients, which are contained either in separate dosage forms *or* in the same dosage form.  Appx6316[claims 1, 7, 8].  Both Otsuka and the USPTO referred to "the composition" (singular) disclosed in Wong, despite the fact that Wong expressly teaches that this composition may encompass multiple dosage forms.  For example, the examiner stated that Example 2 of Wong, which expressly recites two separate dosage forms, "describes the preparation of the composition" claimed in the '350 patent.  Appx4265.  Otsuka similarly referred to Wong as disclosing "a composition comprising a combination of" an NRI and an antipsychotic agent.  Appx4769.  Otsuka also submitted several literature references to the USPTO during prosecution that describe "[c]ombination therapy" or "combined treatment" of mood disorders.  Appx2784-2807 (alteration in original); *see also* Appx6219-6222.  In these references, an SRI and an antipsychotic are administered separately and at separate times.  Appx2784-2807.

The prosecution history thus uniformly shows that both Otsuka and the examiner who allowed the '350 patent claims understood the inventive compositions as comprising aripiprazole in either a single dosage form or in separate dosage forms. This Court has held that, "like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent," and thus it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. The district court erred by failing to consider this important intrinsic evidence.

### 3. The Undisputed Extrinsic Record Establishes That Clinicians Typically Use Separate Dosage Forms When Prescribing Aripiprazole in Combination with an SRI

The district court based its claim construction entirely on its review of the '350 patent's claim language and specification, but nonetheless found, based on the extrinsic evidence, that clinicians typically prescribe separate dosages of aripiprazole and an SRI to allow titration of both drugs. The court's findings support Otsuka's contention that a person of ordinary skill in the art at the time of invention would have understood the '350 patent as claiming combination therapy, in which aripiprazole and the SRI may be administered in separate dosage forms and at different times of day.

The court based its finding in part on testimony by Otsuka's expert, Dr. Correll, who stated that clinicians typically prescribe an antidepressant first

and, if a patient does not show a sufficient response, the clinician may then prescribe another drug, such as aripiprazole, to augment the antidepressant. *See, e.g.*, Appx2035[36:6-13]. Dr. Correll also noted the importance of having the flexibility to instruct certain patients to take medications at different times of the day based on possible side effects. Appx2379 ¶ 31. He explained that aripiprazole may cause activation, making it difficult for some patients to sleep at night, whereas SRIs may cause drowsiness that could inhibit a patient's daytime activities. *Id.*; *see also* Appx2034-2036[35:13-37:11]; Appx2218-2222[219:8-223:22].

Dr. Correll also gave his opinion as to how a person of ordinary skill would interpret the '350 patent's disclosures. Unlike defendants' experts, Dr. Correll properly analyzed the full intrinsic record, including the specification as a whole and the prosecution history. Appx2374 ¶¶ 13-16. Based on this review, he concluded that a person of ordinary skill in the art would understand the plain and ordinary meaning of "a/the pharmaceutical composition" and "in combination with" to include both situations where aripiprazole and an SRI are combined in a single dosage form and where they are combined in separate dosage forms. Appx2376 ¶ 22. Dr. Correll specifically noted the many disclosures in the '350 patent specification that the carbostyril derivative and SRI may be given in separate dosage forms and at different times of day. Appx2377-2380 ¶¶ 24-30, 32.

He also analyzed the prosecution history, which he concluded supported his conclusion that a person of ordinary skill would understand that the claimed pharmaceutical compositions are not limited to a single dosage form.  Appx2380-2382 ¶¶ 34-36.

Defendants' experts agreed that patients may take drugs in separate dosage forms and at different times of day.  Dr. Halper testified, for example, that in his clinical practice, he starts patients at the lowest dose that may be effective and adjusts based on the patient's response.   Appx2114[115:3-10].   Dr. Halper conceded during the *Markman* hearing that combining aripiprazole and an SRI into a single dosage form, as required by the court's claim construction, would make it impossible to titrate the dosage of the drugs.   Appx2114[115:11-14].   He also testified that "[a]ripiprazole can cause jitteriness in some patients, so there would be an advantage to prescribing it in the morning.  If the patient is taking a drug that tends to sedate, at least [for] that particular patient, that drug could be given in the evening."  Appx2628[66:13-67:2].  Dr. Halper further admitted that the '350 patent specification discloses several embodiments in which aripiprazole and the SRI are contained in separate dosage forms and are administered at different times of day.  Appx2104-2111[105:13-112:21].    Defendants' expert, Dr. Palmieri, similarly stated that "[p]atients may take different drugs at different times of the day because of potential drug interactions or other reasons."  Appx2640[22:6-9].

Based on this testimony, the district court found that "the undisputed extrinsic reality [was] that psychiatrists do not, as a practical matter, prescribe single dosage forms of antipsychotics and antidepressants." Appx131-132. It also found that "psychiatrists prefer to engage in combination therapy, i.e., to prescribe an antipsychotic in a separate dosage form from the antidepressant, in order to have the ability to titrate the dosages based upon the individual reactions of certain patients." Appx132. The court made this finding based on testimony both by Otsuka's expert, Dr. Correll, and by defendants' expert, Dr. Halper. Appx131-132 (citing Appx2035-2036[36:6-37:11]; Appx2103-2104[104:9-105:7]); Appx2376 ¶ 22; Appx6329[44:17-24]). This finding supports Otsuka's proposed claim construction and is consistent with the intrinsic evidence, which similarly establishes that the claimed pharmaceutical compositions are not limited to a single dosage form.

> **4.    The Court Should Discount Defendants' Expert Testimony Regarding the Plain Meaning of the Claims Because the Experts Failed to Analyze the Claim Language in the Context of the Specification and Prosecution History**

Both Dr. Halper and Dr. Palmieri conceded that the '350 patent discloses pharmaceutical compositions comprising aripiprazole and an SRI in separate dosage forms. Both experts concluded, however, that the patent uniformly teaches that the claimed compositions are limited to a single dosage form. The Court

should discount this testimony because both Dr. Halper and Dr. Palmieri failed to consider the entire intrinsic record and improperly discounted disclosures in the '350 patent contradicting their conclusions.

Both Dr. Halper and Dr. Palmieri improperly ignored every disclosure in the '350 patent of compositions comprising more than one dosage form, merely repeating defendants' argument that these teachings reflect only alternative, unclaimed embodiments. Dr. Halper admitted that he restricted his analysis solely to the language of claim 1, and did not consider the disclosures in the '350 patent specification or prosecution history of compositions comprising more than one dosage form. Appx2559-2560 ¶¶ 27-32. Moreover, he explained his understanding that any conflicts he perceived between the specification and his interpretation of the claim language were irrelevant because the specification and the claims are entirely separate. He stated:

> [T]he plain meaning of the paragraph in the specifications is the plain meaning of the paragraph in the specifications. The plain meaning of the words in the patent claims is the plain meaning of the words in the patent claims. And *the fact that there is a difference between what is in the specifications and what is in the patent claims is, as I understand it, not relevant* for the issue before us today.

Appx2622-2623[43:15-46:17] (emphasis added). Dr. Halper also explained that he sought to interpret the words of the claim without analyzing how a person of ordinary skill in the art at the time of the invention would have interpreted its

disclosure.  Appx2623[47:5-14].  Dr. Halper admitted that he also did not consider the '350 patent's prosecution history.  Appx2617[22:16-24:4].

Dr. Palmieri at least purported to consider the specification, but he stated in his declaration that, "in [his] opinion, a person of ordinary skill in the art would not have gone beyond claim 1" to consider the '350 patent specification.  Appx2584 ¶ 32.  Having already reached a conclusion regarding the claim's meaning, Dr. Palmieri then analyzed the specification only insofar as it included embodiments that fit with his conclusion that the claimed compositions are limited to a single dosage form.  Appx2584-2590 ¶¶ 33-43.  Dr. Palmieri thus discounted every teaching in the '350 patent of compositions containing aripiprazole and an SRI in separate dosage forms, which he argued a skilled artisan would understand are unrelated to the claimed compositions.  Appx2590-2594 ¶¶ 44-55.  Dr. Palmieri also failed to consider the '350 patent prosecution history.  Appx2580 ¶ 17.

The Court should not credit Dr. Halper's and Dr. Palmieri's testimony regarding the plain meaning of the claims because these experts failed to consider the full intrinsic record, and discounted the many embodiments comprising more than one dosage form.  The rest of the extrinsic record supports Otsuka's proposed construction that a skilled artisan would understand the '350 patent as disclosing compositions that may either combine aripiprazole and an SRI in a single dosage form or, instead, may contain the two drugs in separate dosage forms.

60

**B.    The Court Should Reverse the District Court's Orders Granting Summary Judgment of Noninfringement of the '350 Patent**

The district court entered summary judgment of noninfringement in each of the underlying litigations solely based on its conclusion that the claimed "pharmaceutical composition" is limited to a single dosage form.  In the cases where only the '350 patent is at issue, Otsuka moved for summary judgment of noninfringement to permit an appeal to resolve the claim-construction issue. Appx58-59; Appx60-61; Appx62-63; Appx64-71.  In the other litigations, the parties stipulated to partial summary judgment of noninfringement and requested certification of the district court's order pursuant to Fed. R. Civ. P. 54(b).  Appx1-5; Appx6-10; Appx11-16; Appx17-21; Appx22-26; Appx27-31; Appx32-36; Appx37-42; Appx43-47; Appx48-52; Appx53-57.  This Court should therefore reverse the district court's grant of summary judgment of noninfringement in each of the appeals and remand for resolution of infringement based on the correct claim construction.

## VII.  CONCLUSION

For these reasons, the Court should reject the district court's narrow construction of the claim terms "a/the pharmaceutical composition" and "in combination with," which are not limited to a single dosage form.  The Court should therefore reverse the district court's entry of summary judgment of

noninfringement based on this erroneous construction and remand for further proceedings.

Date: September 6, 2016                    Respectfully submitted,

                                           /s/ James B. Monroe
                                           James B. Monroe
                                           Paul W. Browning
                                           Eric J. Fues
                                           Denise Main
                                           Jeffrey A. Freeman
                                           Charles T. Collins-Chase
                                           FINNEGAN, HENDERSON, FARABOW,
                                             GARRETT & DUNNER, LLP
                                           901 New York Avenue, NW
                                           Washington, DC 20001-4413
                                           (202) 408-4000


                                           *Attorneys for Plaintiff-Appellant*
                                           *Otsuka Pharmaceutical Co., Ltd.*

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing CORRECTED BRIEF FOR

PLAINTIFF-APPELLANT OTSUKA PHARMACEUTICAL CO., LTD. on

counsel of record on September 19, 2016 by Electronic Means (by E-mail or

CM/ECF).


| Charles T. Collins-Chase | /s/ Charles T. Collins-Chase |
|:---:|:---:|
| Name of Counsel | Signature of Counsel |

Law Firm:            Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Address:             901 New York Ave, NW
City, State, Zip:    Washington, DC 20001-4413
Telephone #:         202-408-4108
Fax #:               202-408-4400
E-Mail Address:      charles.collins-chase@finnegan.com


NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

# CERTIFICATE OF COMPLIANCE

1.      This CORRECTED BRIEF FOR PLAINTIFF-APPELLANT

OTSUKA PHARMACEUTICAL CO., LTD., complies with the type-volume

limitation of Federal Rule of Appellate Procedure 28.1(e)(2). The brief contains

13,019 words, excluding the parts of the brief exempted by Federal Rule of

Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      The brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 28.1(e)(2) and the type-style requirements of Federal Rule of

Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally

spaced typeface using Microsoft Office Word Version 2010 in 14-point Times

New Roman.

/s/ Charles T. Collins-Chase
Charles T. Collins-Chase
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Attorney for Plaintiff-Appellant*
*Otsuka Pharmaceutical Co., Ltd.*